at all. In case number 16-6347, William Swift at all versus RDP Company at all. Or are men not to exceed 15 minutes for plaintiffs, 15 minutes to the Chair's nine defendants. Mr. Whitfield. May it please the Court. My name is John Whitfield. I'm an attorney in Madisonville, Kentucky. I represent the Clift heirs in this case and I also have the privilege of representing the Story heirs, some of whom are here with us today. I have reserved two minutes on rebuttal. As the Court is well aware, these two consolidated cases basically deal with the validity of a 1977 lease that was executed by the Clift heirs and by the Story heirs with a company called FVQ, which in turn was assigned to the Appleys in this case. We believe the 1977 lease is not valid for two reasons. One is we believe that the 1977 lease in my briefing required a writing. We believe that the lease in question talked about the right to renew and not the right to extend. And because of that, we believe a writing was required. We believe that because of about two different things. And of course you're aware from reading the responsive brief, counsel, that the law in Kentucky more or less, I mean the argument is, that renew and extend, no big difference. I respectfully disagree with that. Okay. And it's our position that. I'm hoping you'll address that. Okay. Thank you. Well, under the 1651 North Collins case, the Sixth Circuit case, we believe that although the right to renew versus the right to extend, the language is somewhat important. The intent of the parties and the conduct of the parties under 1651 outlines exactly how to that was amended after five years and redone. It had the same language, the same renew language. We have a 1972 lease again with the same parties that required, it says renew, and required a writing. And then we had the. There was a writing? Yes, ma'am, there was. And eventually there weren't writings. Eventually they're stopped. People got lazy. People assumed that everything would just extend, renew. What happened? Why did it stop, do you think? Your clients were not jumping up and down. No, they weren't. They weren't jumping up and down. But in our opinion, in our position is, in 1977 the lease terms changed. And the lease terms still said renew, still said five years. Every five years it was to renew. No, there's language in various Kentucky cases about the choice of language really is not the controlling thing. Yes, ma'am. It's our position that that's one spoke in the wheel. That it's not absolute and it's not controlling. But it is one spoke in the wheel. And it can't be, based upon the facts of every particular case. Well, what other spoke in the wheel favors your position? The conduct of the parties and the intent. Well, now, the conduct of the parties was that both of them for a very long time assumed that the lease was in effect, had been extended. Because, I mean, why in the world would your clients have continued to accept royalties until they stopped cashing in? Why would they stop cashing the checks in 2013 and 2014 if they wanted the defendants to stop and they wanted their land back? Well, the reason they stopped cashing the checks in 2013 is because they hired counsel. And counsel looked at it and counsel determined, my co-counsel determined, that the 1977 lease was not valid. When you look at the 1651 case. The point is, I guess, Judge Gibbons and I are both inquiring about the idea that there were decades, at least a decade, where they let it ride. So good checks. So the conduct of the parties supports your position minimally, if at all, in my opinion. Tell me how it does support it. Well, there are references in the record where some of my clients did complain to the defendants and did complain about the fact that they were utilizing the property improperly. Well, that would go to whether the defendants violated any provisions of a lease that was in effect, not to whether there was, in fact, a lease in the first place. Yes, Your Honor. But still, even though, well, even the 67 lease and the 72 lease and the 77 lease all said renew. And we can't, our opinion is, we just can't disregard the first 10 years of the life of this lease. Why is it that there would be renewals for three separate times and then the last lease not required? The terms changed, at least to some extent. They did, but not materially. I mean, they changed the role. There was a reason to execute a new lease because of changes in terms. But one reason, and we think, well, primary reason that there would need to be a new lease in writing is because there were conditions precedent. And there were conditions precedent in all of these leases, one of which was timber, one of which was agricultural lime, one of which were other things. Those were things that had to be done. How can my clients be expected to know whether or not those conditions precedent are satisfied if they don't execute a new lease? And so our argument is that, and we've studied case law, the North American Refractories case basically says that if you have a condition precedent in the lease and there's a term, specific term in the lease, it must be in writing so that everyone will know whether or not those conditions precedent have been satisfied. And there are material issues, in fact, in this case, we believe, that indicate that these conditions precedent were not satisfied. Agricultural lime was never delivered to my clients. Well, the district court thought that the defendants did not have an obligation to deliver. They thought you had a right to receive, but none of that goes to, still, that doesn't really go to the existence of a contract. That seems to me. That goes to quibbling about whether there was compliance with the terms of the contract. That's one of the basis for which we believe the 77 lease is not valid. Even if the court is of the opinion that my client sat on the rights for a certain amount of time, at the end of the day, conditions precedent still have to be satisfied. There still has to be some evidence that the conditions precedent were satisfied, and they weren't in this case. There has to be an objection that says these conditions are not being satisfied. It's not, things can go along swimmingly, until someone says, the lease is not valid, obviously that's happening now. Yes, ma'am. With the advice of counsel. Yes, ma'am. But for a long time, so the court took some import from the fact that for so long, they sat on their rights. And I totally understand that. Sure. And I do. But that segues into the argument that I need the court at least to hear me out on, is the prescriptive easement argument. And that is where Judge Russell basically said that in the story error situation, as the court understood it, there was no reason for the defendant to sit on the lease. There were premises, and then there were other lands, and the other lands were being used by these people. Where is Madisonville, counsel? Madisonville is in West Kentucky. It's between Evansville, Indiana, and Hopkinsville, Kentucky, in I-69. It's right there, right in the middle. It's in West Kentucky. And our clients live right next door, in Caldwell County, Kentucky. All right. Counsel, is there something in the lease that prohibits the use of this property in conjunction with the adjoining property? Yes. Yes. And what would that be? Where is that in the lease? In the 77 lease, there is language about what can be utilized with the premises itself. The 77 lease does not permit the use of the other lands like the Appalachians have been doing. And in fact, Judge Russell found that there was a trespass. But he also found that because there was a trespass, which would be a breach of the lease, which would be a breach of the condition precedent, that because of the length of time, there would be a breach of the condition precedent. There was a prescriptive easement. And as such, this breach would be excused. Well, the problem with that, Your Honor, is that... Can you cite the language in this lease that prohibits the use of the property in conjunction with the neighboring property? Just tell me what paragraph... It's not in there, Your Honor. Oh, I thought you just told me it was in there. No, no. It's not in there. It's our position that the use of the other lands by the Appalachians is not in the 77 lease. It's not permitted by the... How is it prohibited then? I'm sorry? There's no lease for that. Correct. That's right. How is it prohibited by this lease? It wasn't granted. It wasn't explicitly granted. Okay, but how is that a breach of this lease? Because it was a trespass on... But that's a tort under Kentucky law. That's separate from breach of contract. And that's what the district judge ruled, right? Is that your claim is in contract, but what you're alleging is a tort claim. But I'm also alleging that even if it is a tort claim, it's still a trespass and still a violation of my client's rights. But it's not a violation of the lease. We think it is. We think it's a condition precedent. It's a violation of a condition precedent that adequate and lawful use of the land needs to be utilized by the Appalachians. If they breach that and if they trespass on our client's property, then that is a breach of the lease. Now, one of the differences in the 77 from the two prior leases was it has a term of 99 years. Correct. Now, if this is not an automatic renewal situation every five years by the same terms and conditions, and that's what the lease says, why have a 99-year term in it? Well, that's a good question. I mean, if they're going to have a 99-year term lease, why don't they just say it's a 99-year term lease? Why would they say every five years it is renewed? I mean, the word here should be extends every five years rather than renew. Correct. There is a technical distinction in Kentucky law about that. Yes, sir. But isn't the fact that it's limited by 99 years show that this is an extension rather than a renewal? My argument is it does not, Your Honor, and the reason is because the 99 years, in our opinion, is a benchmark. It's a backdrop. But if you have a new lease every five years, why have a limit of 99 on it? Don't know. I mean, I can't answer that question adequately. All I can tell you is it's our opinion that if it was to be truly a 99-year lease, then there would be no need to talk about renewing the lease every five years. No, what you do is you'd extend it every five years. And that way, it would be at least more arguably in compliance with the 99-year term. The parties don't have to extend it every five years, but they can. But it didn't say extend. It said... I know they used the wrong word, but we look at the total document to determine what the terms mean, even if the parties are inarticulate. I understand. I think that's what... You've told us we look at the conduct of the parties. Is there anything else that's another spoke in the wheel? The ten years where there were renewals under the same conditions as Judge Griffin's talking about. I mean, why... That's a part of the conduct of the parties. It is. Is there anything else? No, there's not.  Thank you, Your Honor. Thank you. Good morning. May it please the Court, my name is Corky Coriell, and I represent the appellant, the RDP company, along with my partner, Chris Brooker. We have 15 minutes, along with Lafarge, to present our arguments because the issues are essentially identical as between RDP... How are you going to divide your time? I was going to give Mr. Cantrell for Lafarge the last two minutes to respond to any questions that the Court might have. Okay. So you're taking the bulk of the time. Yes, Your Honor. If that's okay. If the panel would prefer... No, it's fine. Thank you, Your Honor. The appellants reaped the benefits of these leases for more than 35 years. They received royalty checks every month since 1977, and they religiously cashed those checks. When they decided that they were unhappy after 35 years with the payment terms of the leases, they filed these lawsuits in an effort to force a renegotiation. Wasn't it the payment terms? Wasn't it the amounts that they were being paid? Which seemed puny. Well... I don't know the relative value. Which matters a great deal. That was one of the arguments that the District Court considered, the unconscionability argument, were the payment terms too low. And there were a number of problems with that argument as presented to the District Court. First, under Kentucky law, there is no rule that unconscionability is to be decided at the time the complaint is made, or can be determined by changed circumstances, rather than determined at the time the contract is first entered into. There's no Kentucky case law for that. The traditional rule is that unconscionability is determined at the time, and this Court has recognized in the Neely v. Consul case that there is no support in Kentucky law for the proposition that you should evaluate the unconscionability of a deal at the time based on changed circumstances. And as a matter of fact, the only case that the appellants cited to support their claim that changed circumstances should be considered when determining unconscionability is the Kentucky West Virginia Gas case, which was an unpublished decision from the Kentucky Court of Appeals in 1998, which again, this Court addressed the validity and the authority of that case in the Neely v. Consul case and determined that that, because it was an unpublished opinion, was not authority, that the law in Kentucky was that changed circumstances should be considered. Is the claim of changed circumstances limited to the increase in the value of the limestone, that the value of limestone in 2017 is so much more than it was? Or is there something else? Judge, I think that the changed circumstances, from the way the claim was pled in the district court, it was simply that because RDP was receiving X royalty, 33 cents a ton royalty, and the appellants were receiving less than that, 4 cents or 7 cents depending on how much, that was unfair. Just the difference between 4 cents and 33 cents was unfair. What there was no proof of in the district court was whether their royalty was different from the royalties of similarly situated landowners in that part of the state or with limestone quarries. So there was no proof of that. That argument also failed to consider that that 33 cent gross royalty that RDP receives is just that, a gross royalty. It's not a net royalty. That 33 cents is used. RDP is still on the hook for paying property taxes, for paying unmanned mineral taxes, for paying its attorneys to defend the lease. So it's apples and oranges. And finally, the other thing that that argument failed to consider is the circumstances. Of course, unconscionability, you have to look at the equitable side of that. It's not just a number. It's what are the reasons behind those numbers. And in this case, the record established that when my company purchased this quarry in 1986, these leases were already in effect. This quarry, the testimony was, was about to shut down. And RDP came in and over the next 10 years, 11 years, pumped millions of dollars into this quarry to make it a viable operation. But for the investment that RDP brought, this quarry would have shut down. Interestingly, the testimony from the appellants was that these leases, when they were signed nine years earlier, were, in the words of the appellants, a godsend. Mr. Story in particular testified that it was his recollection that his lease allowed the family farm to continue. It supplemented the family farm income. And in fact, they realized more income from these leases than they did from their dairy operations. So godsend is Mr. Story's words. Apparently they had no other use, farm-related use for this land. That is what the record suggests, Your Honor. And in fact, in both cases, they continued, after the leases were signed, they continued to farm the land. And in the Cliffs case, they continued to farm the entire, I believe it was 134 acres that were covered by the lease, right up until recently because quarry operations did not start, or preparation operations did not start on their property until the last couple of years. So they not only received monthly royalty payments, they had the ability to continue to quarry or to farm their land for the last 35 years. All right, counsel, let's get back to the main issue, the renewal or extension here. Yes, Your Honor. I mean, do you agree that the lease uses the wrong term when it says maybe renewed, that it should have used extend? I don't think it's, I'm not sure that I would agree that it's the wrong term because There's a distinction, isn't there? Well, under Kentucky law, there is a theoretical distinction, but the law in Kentucky for 60 years has been that those two terms are synonymous, unless there is proof that the parties intended something to the contrary. And Mr. Whitlow is correct that there are a couple of spokes on the wheel. One is, what does the document say? Does the document itself contemplate that a written renewal is required? And that's the situation that this court dealt with in the 1651 North Collins case. The document in that case said that rental rates would be determined by market value at the time the renewal was attempted, and market value is not a definite term. So that contemplated that there would have to be a determination of what market value is, so a writing would naturally have to be required. That's not the case here. The royalties are what the royalties are. The other consideration, and probably the most important consideration, is the conduct of the parties before the dispute arose. And here, there really can't be any serious argument that the conduct of the parties before this dispute arose indicated that no written renewal was required. The stories cashed more than 400 royalty checks and never once said there was no renewal or that a written renewal was required. Not in 1982, after the first five-year period. Not in 1987. Not in 1992. Never said, hey, wait a second, why are you sending us these checks? Because this lease has not been effectively renewed. The Cliffs, likewise, cashed more than 400 royalty checks and never once suggested that RDP had to renew the lease in writing. Never once even hinted that the lease had not been renewed. So the conduct of the parties here clearly establishes what the Lexington Flying Service case created as the Kentucky rule, and that is what you look at is the conduct of the party. And that is infinitely more important than the words that are used, and whether it's renew or whether it's extend. What do you say with respect to the prescriptive easement argument? I agree with what Judge Russell thought on the prescriptive easement argument that the stories can't have it both ways. They either granted permission to use their property in connection with the quarrying of other properties, or they didn't. And you can't say on the one hand that we didn't grant that permission and therefore you breached the lease, but then on the other hand say, ah, you did grant that permission. We knew you were doing that, and therefore you were not possessing or using the property actually openly and notoriously in some way that we did not give you permission to do. So they can't have it both ways. And if it is indeed their position, and it is because they pled it, that we did not have the right to use their property in connection with the quarrying of other properties. Were the payments intermingled, that is, or were they separable for the so-called trespass on the other property? They received one check, and it was a royalty check. Oh, but particularly for the mining or the quarrying that they did on the other property? There was no, they didn't receive anything other than the royalty check. They didn't receive a separate check for the use of their property. Okay. So were they paid at all for that extra? That's an argument. They were not paid for... It's something they now say, no, I didn't grant you. Maybe I knew it, that you were there, but I did not grant that permission with this lease. That's correct. They say that. But did they get paid? So is there any way to say that the use of that adjacent property was, there was some compensation for that use? We believe that the compensation was the royalty payments that they were receiving because... Part and parcel, it's all... Correct, because the lease does not say that we can't use the property for. The lease is silent on whether we can do that. We did it. They knew we did it because they lived right next to the quarry, and they farmed the property right next to the quarry, and the testimony in the record from Mr. Storey was, he went to the quarry hundreds, on hundreds of occasions, and he saw the quarry on almost a daily basis, and he could see the quarry from his backyard. So they certainly knew what the extent of the operations were. They knew that there were buildings and activities and operations going on that they now claim that were not allowed by the lease, and they didn't say anything until 2013. I want to just briefly address, too, the notion that the leases were violated. The payment terms, they claim that the leases were, the conditions precedent were not performed, that the payment terms were not satisfied. That was kind of a moving target for both of these appellants throughout, but the district court correctly concluded that there was really no legal basis in interpreting the documents for agreeing what they claim the payment terms were. The district court also agreed that there was no factual basis to support their claims that they had not gotten agricultural lime. The lease says the agricultural lime is, they can come get it at the quarry. That's the lease's words, not mine. Their claim that we were required to put it on a truck and take it out to their fields to spread it for them is simply not supported by the lease. So with that, I see my time is up, Your Honor, and I will turn it over to the gentleman from Lafarge, just in case you have any questions that you want to direct specifically at Lafarge. Thank you. Good morning, Your Honors. May it please the Court, Luke Cantrell for Lafarge West, Inc., and I'll just open it up if you all do have any questions specifically for me. I have none. It appears we have no questions for you. Thank you, Your Honors. Thank you for appearing anyway. Thank you. Thank you. Probably the easiest appearance ever. Sometimes it passed. Okay. Mr. Whitfield, did you reserve some time? Thank you, Your Honor. I would like to make reference to Judge Cook's questions about the prescriptive easement. As we've learned in this oral argument, my clients received not one penny for use of the other lands by virtue of the lease. Secondly, there was no ability for them to utilize these other lands pursuant to the terms of the lease. The lease did not address it, as Judge Griffin and I talked about. And as a result, there... I need to try to get deeper into that. You say they weren't able to or they got not one penny for that additional use, we'll call it the adjacent land use. Yes, ma'am. I thought I understood from your learned opponent that it was all together. Whatever use they made, they paid you. I know you didn't cash the checks lately, but they paid it all. It's all together. They know what they took, what they mined or quarried, and then they wrote you a check for that. Now, indistinguishable from the other work, but how do we know, how do you know that you weren't paid for that? Because the lease said we were going to get 7.5 cents per 4,000. So there was a number, a finite number based upon that. And so there was no language at all in the 77 lease. But if they took rock, for example, from another property, you would still have paid them a royalty on that, correct? They should have paid us a wheelage fee. They should have paid us some other additional compensation for the right to do that, and they did not do that. Well, did you segregate the rock that came from an adjoining property and the rock you took from the property you had leased? We didn't, obviously. So they may have gotten compensated for that. It's not provided for in the lease, Your Honor. Nowhere in the lease is it provided for that they can do that. They can only mine on the premises itself, pay us 7.5 cents. If they didn't segregate it and you didn't try to find out about it, we really don't know whether they were being compensated for rock that came from other property, right? If neither one of you segregated it and you're being paid a royalty on the production of the quarry. But not the other lands, Your Honor. Not the other lands. There's nothing in the 77 lease that gave them the right to do what they did. And in regard to the prescriptive easement, Kentucky law is crystal clear that you cannot create a prescriptive easement by permission. And they were on my client's property by permission, by lease. And the two cases cited by Judge Russell. The other property you're referring to, did that belong to your clients?  No. Okay. Thank you, Your Honor. Thank you. All right. Thank you both or all for your argument. We'll consider the case carefully. And you're excused.